Thank you, Your Honor. May I please report, I'm counsel for Universitas Education, LLC, which was a victim of having its funding for its charity stolen by one of the trustees of a retirement fund of its principal benefactor in the amount of $30 million. That theft occurred in May of 2009. Here we are 15 years later and only approximately $6 million of the $30 million has been recovered. The perpetrator served less than two years in prison. He's out of prison now, Daniel Carpenter, and he set up a network of over 200 entities that frustrated any creditors that he had or that businesses of his had. And he has used that network successfully to largely frustrate the attempts of Universitas to recoup the monies that the Southern District indicated it was entitled to as a result of enforcing an arbitration award that it won against Nova Group, one of Mr. Carpenter's. Counsel, do you understand yourself to have been obligated under claim preclusion rules to have brought any combination of entities into your other proceedings or because you're chasing after money and there are a lot of entities, you're under no obligation? Let me explain, Your Honor, what our approach was. There were turnover proceedings, as the Court is aware, before Judge Swain in the Southern District of New York. And what Universitas did was to target in those turnover proceedings the entities that transported the money and basically large amounts. So they went after Gristmill Capital for $30.6 million, Gristmill Trust for $4.4 million, Gristmill Holdings for $21 million. Now you're now talking about the second turnover proceeding. Is that correct? The first turnover proceeding was with respect to a very small amount of insurance proceeds. It was very limited in scope. It was for less than $400,000, but it was cash that Universitas needed. So it was a very tailored and limited... And at that time, this was a turnover proceeding that was based on a judgment that ran only against Nova, not against Daniel Carpenter yet. That's right. He wasn't convicted until later. Was it that turnover proceeding, that first one, in which he was found responsible for the judgment? He was found to be responsible in the arbitration decision. I mean, they clearly indicated in the arbitration decision that he was the real party of interest and he was the one that controlled Nova. But when the judgment was entered... You know, all of this is highly technical stuff, and I want to make sure I understand what exactly happened. The judgment that confirmed the arbitration award, was Daniel Carpenter a party to that judgment? Was there a judgment against him? No. Okay. No, he wasn't, Your Honor. So initially, the judgment for $30 million ran against Nova. And the first turnover proceeding was the point in which Daniel Carpenter is declared liable for that judgment. That's correct. Okay. So then the second turnover proceeding is what you're talking about now. That's right. And that's directed at certain individual entities. And your point is that those entities were kind of first-line fraudulent conveyances away from Nova, the insurer, to other entities controlled by Daniel Carpenter. That's correct, Your Honor. But your organizing principle was these were... had promise of larger amounts of money? Is that the... Yeah, we were going after the money to try to recover it. We thought we could recover the money against these entities. But in fact, they had dissipated. Yeah, because in that proceeding, you had evidence evidently that these entities had received the proceeds, the stolen money, that was due to Universitas. But then in that proceeding, it turned out, yeah, you're entitled to a judgment against them on that theory, but they didn't have that money anymore. Yes, that's right. And just to give an example, there was fraudulent testimony in the arbitration that was also fraudulent testimony that there had been a modification to the retirement plan in the amount of $6 million that never happened because the co-trustee, which was Wispas, never approved it. So from the very beginning, this was an effort to commit fraud after fraud. So as of the second turnover, the judgment in the second turnover proceeding, you had not made any argument in the form of, we don't care where the money that X entity has came from anymore. We're just going to proceed against them on the theory that they are alter egos of Daniel Carpenter and Daniel Carpenter is responsible for the whole judgment. That argument had not been made in the second turnover proceeding, I take it. Well, we went after the entities that had the money. It turned out they didn't have the money. It turns out they didn't have the money, or if they did, we weren't able to get it. But in the proceedings that are in the case that's before you today, we went after hard assets. We didn't make any allegations that any of the defendants in the case that's before the court today had any role in the laundering of the money or the theft of the money. It was a totally different case, totally different parties, totally different circumstances. And that was the expectation of the parties. That was our expectation that it was different because it had nothing to do with the enforcement of the arbitration award. It had to do with other assets that we believe through Vail Pearson belong to Daniel Carpenter. But it does have to do with the enforcement of the judgment in the sense that that's what entitles you to get these hard assets, is that the perpetrator, the judgment debtor, Daniel Carpenter, owes you a lot of money, and these entities are his alter egos. And so what is theirs is his, and what is his, up to the tune of $30 million, is yours. That's the theory, right? That's true, Your Honor. And do you agree that in theory at least, in theory at least, a turnover proceeding could encompass such claims? Yes, we can see that it could. But it would not be consistent with the trial unit of going after the attorney decision as to how we want to organize the way in which we're going after assets. Well, that was certainly part of it, Your Honor. But it was also a creature of necessity and expectation. I mean, one of the most remarkable things to me about the decision below is that both Judge Meyer and Judge Dooley say, yeah, you probably should have gone after 200 parties in that proceeding. That is completely inconsistent with the goal of res judicata to get finality and to have an effective judicial administration. Why is that? Why would that be inconsistent with finality? Because you're going to have to do an analysis of every one of those 200 entities to find out what their relationship is with carbon. I don't want to put words in your mouth, but the way I understand your argument, and you can tell me if I've got this backwards or something, is that a strategic decision by a lawyer, I've got five possible claims against this defendant. They all arise out of the same transaction. I'm just going to make these claims in the first instance because they're the most likely to win. And if I don't win, they'll come back with the others. That's exactly what res judicata claim preclusion is supposed to preclude. You're supposed to bring them all at once. And I take it that your argument is that given the flexibility that New York grants in the res judicata area to be cautious about the injustice that could result from a literal application of that rule, we should be particularly cautious in the collection context. Because when you are not talking about the substantive claims, but you're talking about efforts to collect from recalcitrant judgment debtors who have not paid their judgments, the whole problem is you're chasing money all over the place. And it's a constantly moving target, both because of possible fraud by the various alter ego companies and because of limited information that the judgment predator has. Necessarily, there is a kind of staged proceeding, and it would be grossly unfair, would be your argument, to apply the same kind of res judicata rules rigidly that would be applied with respect to substantive claims in litigation. That's correct. And that is absolutely the fact in this circumstance. The cases that were relied on by the Court below to support its res judicata argument involved a second effort to collect the same amount of money that was owed after the first instance. And that is not at all what our case is in Connecticut or what is the case before you. So I'm just going to go back to my first question, because I didn't get an answer, and I would like an answer to it. Were you under any obligations pursuant to res judicata law to group any of these collection efforts together in a single proceeding? Or is it your understanding, is it your argument, that you have the discretion to do one turnover proceeding after the next, after the next, after the next? Or is it something in between? No. I think it's something in between, Your Honor. I mean, it's certainly we certainly are aware of the Court's holding that it's claims that were brought or that could have been brought. But what we did was we went after the whole universe of the money. We didn't just pick a carpenter financial group and have a separate proceeding for that. We grouped everybody that got the money that totaled to $30 million. And none of those parties, GASI or TSG in the second proceeding, or Gristmill Partners, none of them were alleged to have gotten the money or to have participated in the laundering. So it was perfectly logical for us to go after all of the money and the entities that had that money. And that's what we did. But you're not claiming, are you, that you were I understand, again, this is sort of going back to what both of my colleagues are asking. I understand the strategic decision to say, I can make this add up to $30 million with just these X parties. But I don't think you've been claiming that you were unaware of these other parties or the possibility that they were entangled in this. No, we weren't unaware. And we certainly are not making that argument. And we did take discovery, which showed some of the involvement of some of the other individuals that were not named. But what we focused on was where the money went and who had the money, to the best of our knowledge, at that time. And we named everyone that had the money. So it wasn't just the lawyers saying, let's cherry pick these few and forget about these. You named all of the parties who the evidence in your possession at that time showed had received transmission of funds from NOVA. No, there were some that received small amounts. The trust, the four or five trusts, received $300,000 each. So there were some smaller amounts that we didn't. We went after the lion's share to try to get full recovery. That's what we did. But do you contend now that you could bring a claim against those charitable trusts? They named defendants here. But the charitable trust had no expectation that they would be included in the turnover proceedings, Your Honor, because their position was that there was no diversity. The basis of jurisdiction in this case, in Judge Swain's court, was diversity. There's one case in particular, even though it's a district court case in the Southern District of New York, that we've cited in our brief and I would like to direct the Court's attention to, and that's American Federated Title Court v. GFI Management. And in that case, there were claims seeking to enforce prior judgments against parties who were not parties to the prior lawsuit. And the Court held that they are not considered attempts to relitigate issues already decided. The issue of contractual liability was litigated in a proceeding in which the defendants here were not parties, and it involved issues distinct from whether defendants are liable or not. I think I'm familiar with that case now that you've described it and not just given the name, but is that not a case in which that was in effect the first effort to collect on the judgment because they had not been parties to the underlying case? That's right. And I guess what the defendants would say is that's distinguishable because here there are successive collection efforts. They're not saying that all of these parties, it's res judicata because they should have been included in the arbitration or in the confirmation proceeding in the district court. They're saying that once you start bringing collection actions, you have to bring all the collection actions that are possible. But there's also an important holding in there where the Court held that once you have a suit on the contract, in that case, to collect, veil pissing is a completely different animal and is not barred or otherwise it would effectively make the statute meaningless in New York that allows specifically veil pissing. My time is up. It is. You have two minutes for rebuttal. Thank you. Here from, is it Mr. Slater first? Yes, Your Honor. Good morning. May it please the Court. My name is Ken Slater, and I represent the parties that Judge Meyer referred to as the Benistar defendants, which is specifically Mollie Carpenter, Benistar Administrative Services, Inc., Moonstar Partners, and PPG Group, Incorporated. Contrary to the suggestion that the underlying courts, Judge Murray said that 200 parties had to be sued, although consistent with race judicata, if they were known and they were asserted to be alter egos, perhaps they should have been brought in one proceeding. But my clients were all well known to the plaintiffs in this case. They participated. They were involved. And then Mollie Carpenter and Moonstone, at least, are actual parties to the first turnover proceeding. That is correct. They were in that turnover proceeding. They appeared in that proceeding. That is correct. And your argument is, I mean, I guess they were sued on some theory that they had received the money in the first instance from NOVA. Is that right? But they were not, there was no allegation that they were alter egos. There was no alter ego charge in that case. Correct. And your position is, and there very well could have been, it would have been easy enough, because that is a separate theory, a separate claim, but it's still an attempt to collect from them on this judgment. And that claim, in your view, should have been brought in that proceeding. And that's the heart of race judicata. The fact that you've made a decision, a strategic decision as counsel, to make certain claims and not make others, if after the fact you are not successful in your ultimate goal, you don't have an opportunity to go back to the court and litigate another claim that you could have raised in the previous action. And that's precisely what we're arguing. And I'm just trying to confirm, Fats, here, if you would, your clients are MOLLE and Moonstone, but also TPG? That's correct. And also Benestar Administrative Services. But there's a direct connection between MOLLE and Trudeau with both of those. Well, I just want to make sure I have, my notes have MOLLE and Moonstone in the first turnover proceeding. Were TPG and BASI in that proceeding as well? No, they were mentioned in the arbitration proceeding. And the, so as was the reference Trudeau and what was often called BASI, the Benestar Administrative, they were subpoenaed prior to 2014. So these parties were all known to and involved in either the direct action or at least some kind of a discovery proceeding. Well, I mean, again, it seems to me there's a difference between an argument that you came after my clients in a turnover proceeding and you just didn't make, bring, use all the theories that you could have. In other words, as I read the first turnover proceeding, the argument was they should pay because they are the recipients of fraudulent conveyances out of NOVA, the direct judgment debtor on this judgment. That seems to me to be a different argument. I take it you would say, tell me that it's just as good, but it's a different argument than the argument that there are other entities who could have been pursued to collect this judgment on alter ego theories, but who were not sued at all in the first turnover proceeding. I don't know whether they were pursued in another turnover proceeding, but I'm trying to take them one at a time. But that is a different situation and a slightly different argument. That's the argument that at the beginning of your argument here today you said, well, those guys are going to be talking about that kind of stuff and maybe you think they're all governed by race judicata, but it is not as straight up as the argument about Mali and correctness of them. It's a red herring to suggest that there's hundreds of others. These were people that were very directly involved, that the plaintiffs knew about. They made a strategic decision to not make them parties. There's no dispute that they're privity. Of course, the argument, whether the district court specifically said you had to sue 200 people at once, the broad race judicata argument that is being made would require that, would it not? Because if counsel for the judgment creditor was aware of the existence of various companies and was broadly aware that Daniel Carpenter was, to use the precise legal term, a crook, they should have sued everyone because any one of those companies could have wound up with the proceeds and any one of those companies, even if they never wound up with any of the proceeds, might have other assets that you could collect against on the theory that they were alter egos of Daniel Carpenter. That theory, if that's what race judicata requires, then any entity that had any connection at all to Daniel Carpenter should have been sued regardless of whether there were easy targets that may have seemed to have all the money, regardless of whether there was any actual evidence that they were specifically alter egos of Daniel Carpenter, whether or not there was any actual evidence that they received any fraudulent conveyance. Since their identity was known, they all should have been sued. Well, certainly if the knowledge about them was similar to the knowledge about my clients, it's possible that information could have been gleaned later. There are some machinations. And what was that knowledge that was had about TPG and BASI at the time of the first turnover proceeding? That they were directly controlled between Carpenter, between Molly Carpenter and Daniel Carpenter. Daniel Carpenter and Trudeau. Yes. And there was this general theory that there was a whole series of these things that Dan Carpenter in particular was trying to manipulate. And there's no dispute in this case. There is privity. And the privity here is not something that was discovered later on. So it's undisputed that there's privity, and then the principles of race judicata apply, and Judge Myers did an excellent job. The plaintiff had to have had enough evidence to make a plausible veil-piercing claim against those defendants in order for that to apply, that principle to apply. As opposed to just, we know that Daniel Carpenter was mixed up in these things. I think you'd have to have some knowledge, but that's here. Okay, that's here. Well, we'll figure out whether it's here, I guess. Thank you. All right. John Einhorn. Good morning. May it please the Court, my name is John Einhorn from New Haven. I represent the trusts and the LLCs. There's only two matters I wanted to address before the Court this morning. Actually, Judge Lynch, just more eloquently than I could ever put it, raised the main issue which Judge Dooley based her race judicata opinion on at page, basically page 14 of her memoranda. Judge Dooley talks about the fact that while it would likely have been frustrating and perhaps quite difficult to seek turnover orders against potentially hundreds of Carpenter entities, that's not a basis to thwart the ultimate goal of race judicata, which is the avoidance of piecemeal litigation and the finality of judgments. And in response to the question Judge Merriam asked plaintiff's counsel, they don't deny that they were aware of these entities previously. They admitted, and Judge Dooley found, in fact, that that was the case, that they never allege affirmatively or assert that they were unaware of those entities. And the second point I just wanted to make here this morning, because I know both Mr. Slater and Mr. Scars may have more specifics if you need it on the race judicata legal arguments, is this, that the plaintiff seems to say, and this seems to be the nub of their argument, that in their reply brief, they asked the court to ignore the law and to take, quote, a pragmatic approach in finding that the district court erred in working considerable injustice by effectively rewarding Mr. Carpenter. Well, I think in fairness, the argument is not that we should ignore the law. The argument is that New York law includes a principle of some level of pragmatism. And I would at least rule out under that theory that we have to make sure that the good prevail and the evil are punished and thus ride roughshod over principles, but that we should take account of the structural situation and the structural distinctions that are relevant to collection proceedings. Yes. Because whether or not Daniel Carpenter is the uber criminal that he's painted as, one of the problems that concerns me is even with respect to some of the entities that Mr. Slater talked about, suppose they didn't have – he got a judgment against them. They didn't have any money. He didn't get a judgment against some of your people, and maybe he could have pursued them. But, you know, even if there's some other entity that is out there that could be located, all a judgment – a canny judgment debtor would have to do is transfer money back to somebody who got sued earlier. And then that money would be protected. And don't we have to worry about things like that in applying res judicata? Well, here we're working within the confines of the record. And in the record in this particular case, they never denied that they weren't aware of these entities. They could be aware of the entities, but is it really the goal of res judicata and of efficient judicial administration? In the collection context, when I'm talking about you have to bring your contract claims in the same case as your tort claims and it's the same transaction. But once you've got a judgment and you're chasing money all over the place, is it really what we want to sue any entity that has any connection at all to a judgment debtor? Regardless of what exactly is known about where the money went or who has money and who doesn't have money, rather than do this in some stages, that makes sense. I think they had it within their power to have raised an issue like that before Judge Dooley. And in other words, to go into some detail as to these entities. They chose not to do it. What Your Honor is positing may well make some sense, obviously, not only on an equitable basis, but maybe you're also talking about changing the law or creating law on turnaround procedures. Maybe some of the law that needs to be created would have to be created by the New York Court of Appeals rather than by us in any event if what we're talking about is a somewhat novel application of their pragmatic rule. Are you aware of any authority for application of an equitable principle like what's being invoked? No, I don't believe so. I think it's footnote 13, Judge Dooley actually addressed the issue about equity. Should equity overrule race judicata? And I believe she found that there's no basis for that. And also in our brief, Mr. Sandberg and I wrote, there's a section on that where we talk about the inapplicability of just general principles of equity overruling the laws and requirements of race judicata and the importance it plays and so forth. So I think in the long term, maybe the court should think about somehow structuring the relationship of parties and judgments and debtors and turnaround proceedings. But in this particular case, the plaintiff did not come to Judge Dooley and say, well, wait a minute. These particular alter egos are whatever, or we know about them, but we don't know about them. They just never went there. And I think that's the problem with starting a new rule based upon this case. Well, I don't know about new rules. The paramount pictures decision in the New York Court of Appeals in 2018 says that race judicata is grounded in public policy concerns, including fairness to the parties, and is intended to ensure finality, prevent vexatious litigation, and promote judicial economy. However, New York takes a pragmatic and flexible attitude towards race judicata, recognizing that if applied too rigidly, it could work considerable injustice. You know, there's an interesting issue that we've all briefed also, and I think it's a question about whether or not New York law governs or federal law governs. New York law governs. That's an easy one. Assume that we will conclude that New York law governs. But I do think that the public policy part of that quote has to do with the finality issue of race judicata. That's the public policy issue, I think. All right. Thank you.  Mr. Stein. Good morning. May it please the Court. Jeffrey Sklarz for Gristmill Partners. Speaking to the knowledge element, Your Honors, Gristmill Partners was the subject of many proceedings before the Southern District.  Specifically looking at page 92 of the Appellee's Appendix, Judge Swain specifically addressed Gristmill Partners when, after the blanket injunction was entered in January of 2014 and joining all so-called carpenter entities, Gristmill Partners, which is a single-asset real estate company, no allegation that it was ever involved in anything, it sought to enter into a lease with a third-party entity and had to go to court to allow that to happen. What more could possibly have Universitas needed to know once that proceeding was brought? Gristmill Partners, I thought, was – there was an allegation that Gristmill Partners – maybe I'm getting – there may be too many Gristmill entities. Your Honor. But I thought Gristmill Capital, LLC, Gristmill Holdings, LLC, these are – are these Mr. Einhorn's clients and not yours? Or are these yours? I don't believe they're anybody's entities. And Gristmill Trust Welfare Benefit Plan, these were all entities that were in the second turnover proceeding and there was an allegation against that. Either in the first or second turnover. Okay. But your client, your Gristmill, is the owner of the office building that got searched in the IRS and Labor Department proceedings that I have some familiarity with. Correct. That's the Gristmill that we're talking about here. Yes. Because you're saying they were not – there was no allegation against them in the second turnover proceeding. And that is presumably because there was no evidence that any of the money from Novo went to them. The only theory on which it seems to me that the plaintiff could go after your client is the alter ego theory. That's correct. That they own this land. That means Daniel Carpenter really owns this land. Daniel Carpenter owes me money. Therefore, we want that money from your client. Correct. That's the theory. That's their theory. And that theory – not only has that theory never been advanced, but your client has never been named in any of the turnover proceedings in New York. It has been named in various proceedings. Well, named as a defendant from whom relief is sought. In the third turnover proceeding, which concluded 11-12-2015, which is our appendix, Gristmill's appendix A at 141, Judge Swain specifically addressed this in paragraph 4, page – And she said I don't have jurisdiction. If I had it, I wouldn't use it and go away, get out of here. Well – Is that pretty much what she said? I don't think it was quite that. She says a charging order, which they already had against Gristmill Partners in Connecticut, does not transform into a property interest, and they need to do something else. Then there was a later proceeding where she says go away. But again, what we're looking at is the suggestion that there's all these entities and we can't possibly identify any of them. Well, Gristmill Partners, they knew from basically day one. This is the so-called – where all of these alleged activities take place. And they go after Gristmill. And it's a chunk of – it's a property in Connecticut that presumably is worth some decent amount of money that a judgment creditor might want to go after. Millions of dollars. And, in fact, there's a letter written by Curaleaf's lawyer, which is referenced in our papers, where they explain Universitas asked for half a million dollars to even consider letting them out of the injunction. So they knew they could monetize this. They knew the property. They knew everything they needed to know. And as Judge Dooley held, there are no factual allegations related to the alter ego claims that occurred subsequent to the August 2014 judgment. That's a second turnover proceeding. But what happens with the Curaleaf proceeding, that's in February of 2014. That's in between the two turnover proceedings. So they could have amended their turnover claims. They chose not to. Again, this is litigation strategy, not – they couldn't do it, particularly against Gristmill. Thank you, Your Honors. Thank you. Mr. Mattson, you do have two minutes for rebuttal. I was going to mention the exact quote that came from the bench from the Hansen case. I'm not going to repeat it, but the site is Hansen v. Miller, 52, Feb. 4, 96-101, Second Circuit, 2022, which goes to the pragmatic and flexible attitude that New York takes in a race judicata setting. The other case that we relied on in our papers is Roddy v. Reed. That's at 379 NE 2nd, 172, where the court said improperly seeking to deny a litigant two days in court, courts must be careful not to deprive them of one. And that's the situation with TPG, Bassey, Gristmill Partners, who were never sued in any of the turnover proceedings. What he's talking about is an injunction that went to payments that would be coming in to Gristmill Partners. Throughout this case, Gristmill Partners has trumpeted, hey, we never got any money, we didn't participate in the crimes, and that was the exclusive focus on what the turnover proceedings were about. Could you have sued them in the turnover proceedings? The second, take the second, Southern District? Could we have gone after Gristmill Partners in the turnover? Yes. On an alter ego basis, yes. Yes. Any of the entities in this you could have? We could have. But that wouldn't make for a sensible trial unit and it wouldn't match with the expectations of the parties. The quote that was given by Mr. Einhorn from Judge Dooley, he didn't read the end of that quote. And the end of that quote in the decision says, we're not going to consider the equities among the parties. And that is wholly inconsistent with the case law interpreting the statute of New York. All right. That's your time, Mr. Manson. Do you want to wrap up? Yeah. Sorry. Special Appendix 63, footnote 13. The court declines to weigh the equities between the parties. Thank you. Thank you so much.